FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

99 APR -9 PM 2: 18

U.S. DISTRICT COURT
N.D. OF ALABAMA

ROBERT E. BARNES,

    Plaintiff,

vs.                                                  CASE NO. CV-98-J-680-NW

REYNOLDS METALS COMPANY,

    Defendant.

**ENTERED**

APR  9 1999

### MEMORANDUM OPINION

    Currently pending before the court is the defendant Reynold Metals Company's motion for summary judgment (doc. 29), to which the plaintiff filed a brief in opposition thereto ("plaintiff's opposition"). Thereafter, defendant filed a reply to plaintiff's opposition. Both parties have also filed evidentiary submissions in support of their respective positions. The court has reviewed the motion, the memoranda of law and the evidentiary submissions of the parties.

### I. PROCEDURAL HISTORY

    Plaintiff commenced this action on March 23, 1998 by filing a complaint (doc. 1) alleging that the defendant discriminated against him in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*. The plaintiff filed an amendment to that complaint on August 28, 1998, setting out a second count for breach of contract on the theory that the defendant violated its own Affirmative Action Program in terminating the plaintiff. Neither party having requested oral argument, this court considered

42

this motion upon the pleadings, briefs, and evidentiary submissions. Having considered all of the foregoing, the court concludes that the motion for summary judgment is due to be granted on all counts of the complaint.

This court has jurisdiction of this case pursuant to 42 U.S.C. § 12101 *et seq.* and 28 U.S.C.§ 1331.

## II. FACTUAL BACKGROUND

In the light most favorable to the plaintiff, the facts of this case are as follows: The plaintiff began working for the defendant as a maintenance supervisor on May 16, 1980. The plaintiff worked his way up in the company to the position of Maintenance Area Team Leader, Grade 4. Complaint at ¶ 6. In October, 1993, the plaintiff suffered a ruptured vein and was diagnosed with Arterial Venous Malformation (AVM). Plaintiff was off work due to problems from this condition until January, 1994 when he returned to work with doctor's restrictions. Complaint at ¶ 7, January 2, 1994 letter from Dr. Clarence B. Watridge, M.D., submitted at Tab B to defendant's summary judgment submission record,[1] depo. of plaintiff at 50. The plaintiff testified that he returned to work at that time because Doug Collins, the plant superintendent, came to his home and stated that if the plaintiff would return to work, the defendant would "find something for [him] to do." Depo. of plaintiff at 55. Plaintiff was

---

[1]This letter states that the plaintiff is able to return to his sedentary job as a supervisor but can perform no heavy lifting or heavy exertion, but should be able to supervise a staff of workers.

2

given a daytime office job doing various forms of paperwork.[2]   Depo. of plaintiff at 59-60.

Dale Hornsby, the plaintiff's direct supervisor at the time, tried to place the plaintiff back in the same position he had held previously, but thought the plaintiff was not able to do the job at that time due to his illness. Depo. of Hornsby at 22. He testified that he consulted with his superiors and that all of them believed that the plaintiff would recover fully, so they "moved other players on the chest (sic) board, so to speak, to give him the opportunity to show us what he could and couldn't do .... We created a position for him where his mainly stayed at his desk in the maintenance department and helped with his technical expertise and knowledge of the plant...." Depo. of Hornsby at 23-24. *See also* memorandum from Hornsby to Martin Hardy, dated January 28, 1994, submitted at tab 8 to plaintiff's evidentiary submissions.

In May, 1994, Dr. Watridge wrote Dr. Shanahan, the defendant's company doctor, a letter stating that the plaintiff "is now in a position to return to his job as supervisor" with restrictions of no lifting more than twenty pounds and no climbing. May 12, 1994 letter from Dr. Watridge, submitted at Tab B to defendant's summary judgment submission record. *See also* depo. of Hornsby at 41. The plaintiff testified that his job did not require him to do any heavy lifting or heavy exertion at all. Depo. of plaintiff at 56, 189. Similarly, the job did not require any climbing. Depo. of plaintiff at 106-107, 190. The plaintiff was moved to the

---

[2]Plaintiff testified that he requested the midnight shift as a supervisor, but his boss stated that he would rather have the plaintiff on day shift so he could be watched. Depo. of plaintiff at 57.

3

position of shift supervisor over production. *Id* at 64. The plaintiff also testified that he worked as a facilitator during 1994 although he was unsure of the time frame. Depo. of plaintiff at 66.

In August, 1994, Dr. S. R. Reddy wrote a letter stating that he suggests that the plaintiff work during the day time instead of the night shift. August 26, 1994 letter from Dr. Reddy, submitted at Tab B to defendant's summary judgment submission record. The plaintiff testified that the defendant was going to place him back on the midnight shift and that Dr. Reddy opined that this would be improvident. Depo. of plaintiff at 71. However, the plaintiff also recognized the Dr. Reddy was merely recommending the day shift, but not limiting the plaintiff to only working that particular shift. Depo. of plaintiff at 140, 141.

At some point during this time period the plaintiff was moved to the position of maintenance foreman on an off-shift. Mr. Hornsby testified that his best recollection was that the plaintiff requested this change in position. Depo. of Hornsby at 25, 37. However, due to problems with his attendance, the plaintiff requested to be returned to day shift, however, no day shift vacancies were available at the time.[3] Depo. of Hornsby at 25-26. Mr. Hornsby also stated that he had concerns about returning the plaintiff to maintenance because of the plaintiff's problems with sight, climbing and hearing. Depo. of Hornsby at 28. The

---

[3]Mr. Hornsby did state that he could have moved other employees around to make room on the day shift, although whether this was in maintenance or production or some other area is not specified. See depo. of Hornsby at 29. He also stated his belief that the plaintiff was unable to do the job of maintenance supervisor, but also stated that at the time of the RIF the plaintiff was no longer under his supervision. Depo. of Hornsby at 31, 33.

4

result of this was that the plaintiff was subsequently offered a job in the production department. *Id* at 36.

In the early fall of 1994, around September 1, 1994, the plaintiff was told he was going to be placed as production shift supervisor, although the plaintiff apparently wanted to work in maintenance. Depo. of plaintiff at 101, 104.[4] The plaintiff's title at that time was team leader for the melting area. Depo. of plaintiff at 104-105. This job had the same benefits and the same rate of pay. The plaintiff testified that the difference between production and maintenance supervision is that in maintenance, he actually performed the job whereas in production he only supervised other people doing the same repeated tasks. Depo. of plaintiff at 106.

Then in January, 1995, the plaintiff's family doctor provided the plaintiff with a statement that he was restricted to "Day Shift Only". January 18, 1995, prescription pad note from Dr. Terence T. Hart, submitted at Tab B to defendant's summary judgment submission record. The plaintiff testified that he went to Dr. Hart because he was depressed, and that his depression resolved in three to four months. Depo. of plaintiff at 125-126. However, the plaintiff also stated that Dr. Hart's restriction to day shift was unrelated to his depression, but rather that the plaintiff would do better "emotionally, physically and otherwise" on the day shift. Depo. of plaintiff at 129. Dr. Hart testified that this restriction was a convenience and

---

[4]From the record, the court is unable to ascertain whether the plaintiff was working in maintenance during some time in 1994. Depo. of plaintiff at 1201-102. The plaintiff did testify that he was working in maintenance and wanted to stay there. *Id* at 103.

a precaution. Depo. of Dr. Hart at 15. However, Dr. Hart added that he left those restrictions if they had to be permanent up to the neurologist.[5] Depo. of Dr. Hart at 17. The plaintiff testified that from this point until the summertime of 1995 he worked only day shifts as a facilitator. Depo. of plaintiff at 169.

In June of 1995, Dr. Watridge wrote Dr. Shanahan again, stating that "there is no increased risk for his working as night [illegible] working any other part of the day. Therefore I would have no objection to his resuming his usual rotation and sharing some nighttime shifts as a supervisor. June 29, 1995 letter from Dr. Watridge, submitted at Tab B to defendant's summary judgment submission record, depo of Dr. Watridge at 29. The plaintiff testified that this letter was in regard to him alternating between different shifts. Depo. of plaintiff at 150.

On November 9, 1995, Dr. Watridge again wrote Dr. Shanahan to state that the plaintiff "won't tolerate changing shifts and it would be my recommendation that he go back on a regular daytime shift instead of altering them..." November 9, 1995 letter from Dr. Watridge, submitted at Tab B to defendant's summary judgment submission record.[6] Dr. Watridge testified that he was told by the plaintiff that he was working alternating shifts.

---

[5]Dr. Reddy testified similarly. Depo. of Dr. Reddy at 8. Dr. Reddy also stated that he recommended the day shifts for plaintiff because of the plaintiff stating he was tired. *Id.* at 24, 26.

[6]This letter makes a reference to excessive fatigue related to rotating shifts. This letter notes that the plaintiff has had no real problems with employment "until he had to go on altering schedules and go on nighttime shifts."

6

Depo. of Dr. Watridge at 12. However, Dr. Watridge added that the plaintiff probably could have worked the 3 p.m. to 11 p.m shift, as long as he was not working rotating shifts. Depo. of Dr. Watridge at 13. The doctor's office notes from this time period state that the plaintiff "has done fairly well. He has some residual numbness, most of his visual symptoms have resolved and his strength is now normal. He returned to work and did really well with work except for fatigue at night ..." November 8, 1995 office note by Dr. Watridge, submitted at Tab C as Exhibit 7 to Dr. Watridge's deposition.

The plaintiff testified that at this time, he could have worked as a "team leader, coordinator, facilitator, maintenance supervisor in the general plant, maintenance supervisor in the cast house, maintenance supervisor in salt reclamation, schedule planner, two areas store room , production supervisor unloading and melting. I could work at any job in the plant at that time." Depo. of plaintiff at 155. He added the caveat that this would be limited to day shift. *Id*. He further testified that he was "definitely" able to perform the duties of his job. Depo. of plaintiff at 175, 228.

From November of 1995 until July 1, 1996 when the plaintiff was terminated, he worked the 3p.m.-11p.m. shift. Depo. of plaintiff at 206. The plaintiff testified that during this time period he was still experiencing vision problems in that he would sometimes see double, he had poor peripheral vision and his eyes would tire quickly. Depo. of plaintiff at 218. However, at deposition, he admitted that by November of 1995, his vision problems and strength had improved. *Id*. at 146. Dr. Hart expounded on this by stated that "As far as

7

I know the follow-up angiograms that Mr. Barnes has had, the AV malformation is no longer there and he's had good success with the gamma knife radiation." Depo. of Dr. Hart at 22. He also stated that "... but the specifics, you know, like I said there has been no motor deficit and no trouble with his vision. Depo. of Dr. Hart at 23. Furthermore, when specifically asked about permanent impairments, Dr. Watridge testified that the plaintiff had some residual numbness on the left side of his face, and a little on the right as well, "but objectively he had a pretty normal exam by that time (November of 1995)." Depo. of Watridge at 36-37.

Furthermore, the plaintiff stated that the 3-11p.m. shift caused problems for him because of fatigue. He stated that he would be fine until about eight o'clock and then his body would just "go down". Depo. of plaintiff at 149, 151. However, the defendant's doctor recommended that the plaintiff remain on the off- shift. Depo. of plaintiff at 161.    The plaintiff contends that his remaining on the 3-11 p.m. shift is evidence of the defendant's refusal to accommodate him. Depo. of plaintiff at 228.    The plaintiff also testified that, concerning the defendant's affirmative action policy, he just knew that the policy was to not discriminate. Depo. of plaintiff at 299.

The plaintiff testified that he underwent testing every six months for his medical condition and that "eventually it went away". Depo. of plaintiff at 49.    However, regarding the plaintiff's work restrictions, Dr. Hart stated that he would defer to Dr. Watridge. Depo. of Dr. Hart at 22. Dr. Watridge testified that there is no correlation between AVM and

8

whether a person works a 7-3 shift or a 3 to 11 shift or even an 11 to 7 shift. Depo. of Watridge at 9,10. He also testified that "AV malformations can bleed and cause death, and certainly if people have seizures with AVMs, that limits them at least for a period of time." Depo. of Watridge at 20.

The plaintiff stated that as far as he was aware, the only restrictions the defendant considered as limiting the plaintiff was his inability to lift over twenty pounds and no climbing.[7] Depo. of plaintiff at 210, 216. Plaintiff amended this statement to include his doctors' opinions that the plaintiff should work the 7 a.m. to 3 p.m. shift. Depo. of plaintiff at 214.

In a memorandum dated June 14, 1996 addressed to all employees of defendant, an upcoming "reorganization' is discussed. This document states that "The newly re-organized complex will have fewer slots for salaried positions. We anticipate that approximately 55 positions will be eliminated by the end of July - about 12% of the current salaried group." June 14, 1996 memorandum from H.W. Moore, submitted at Tab B to defendant's summary judgment submission record. In his EEOC claim, the plaintiff stated that his position was not eliminated, but that he was instead replaced by Forrest Rowell. According to plaintiff, he holds a college degree while Rowell does not. Charge of Discrimination, submitted at Tab B to defendant's summary judgment submission record. Rowell, however, testified that

---

[7]As of November 1994, the plaintiff's doctor had changed this restriction to a limit of no lifting anything over 100 pounds. *See* patient note by Dr. Watridge of November 3, 1994, submitted as exhibit to deposition of Dr. Watridge at Tab C to defendant's submissions; depo. of Dr. Watridge at 8..

9

nobody replaced the plaintiff because the position was eliminated.  Depo. of Rowell at 15.
He also did not assume his current position until October, 1996.  *Id.* at 17. Rowell also had
more seniority with the defendant than the plaintiff.  *Id.* at 12.

Doug Collins, the supervisor of production, testified that he was involved in the
decision to include the plaintiff in the reduction in force (RIF).  He knew that there was no
place for the plaintiff in maintenance and therefore offered the plaintiff a job in his
department.  Depo. of Collins at 48.  He stated that he had concerns about the plaintiff's job
performance including lack of communication with his co-workers, an inability to contact
him during his shift and spending too much time on the telephone on non-work related
matters.  Depo. of Collins at 25-26.  Mr. Collins also testified that the shift was changed from
2:00 p.m. to 10 p.m. to accommodate the plaintiff and also told him that he could call in
relief early.  Depo. of Collins at 34.  He stated that when the decision was made to include
the plaintiff in the RIF no consideration was given to the fact that plaintiff might have a
disability.  Depo. of Collins at 43.

### III. STANDARD FOR EVALUATING SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact that the moving
party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986).  As the Supreme Court has explained the summary judgment standard:

10

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322-23. The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issues of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249. The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir. 1987).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding*, 1998 WL 758012 (S.D.Ala.); citing *Anderson*, 47 U.S. at 251-252.

## IV. DISCUSSION

### A. The ADA Claim

The ADA provides that no covered employer shall discriminate against a "qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge or employees, employee

12

compensation, job training, and other terms, conditions, and privileges of employment." 42

U.S.C. § 12112(a). To establish a prima facie case under the ADA, the plaintiff must show

that (1) he has a disability; (2) he is a qualified individual; and (3) he was discriminated

against because of the disability. 42 U.S.C. § 12132; *Swain v. Hillsborough County School

Board*, 146 F.3d 855, 857 (11th Cir.1998); *Pritchard v. Southern Company Services*, 92 F.3d

1130, 1132 (11th Cir.1996). In addition, the plaintiff must show that the employer had either

actual or constructive knowledge of the disability or considered the employee to be disabled.

*Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir.1996).

The defendant argues that plaintiff is unable to establish that he is "disabled" as that

term is defined by the ADA. *See e.g.*, letter response of defendant to EEOC Charge,

submitted at Tab 10 to plaintiff's evidentiary submission. Without meeting such definition,

the plaintiff is necessarily precluded from establishing that he was wrongfully terminated due

to a disability in violation of the ADA.

The ADA defines disability as (A) a physical or mental impairment that substantially

limits one or more major life activities of such individual; or (B) a record of such an

impairment or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).

Plaintiff apparently argues that he falls within the first category of disability as the plaintiff

states that "he has a disability which substantially limits his major life activities." Plaintiff's

opposition at 5. Plaintiff argues that these major life activities from which his is limited

include that he is no longer able to participate in recreational activities, he is suffering from

poor eyesight and he is fatigued.[8]  Plaintiff's opposition at 5.  Recently, the United States Supreme Court examined subsection (A), above, and stated that an analysis under that subsection has three parts. These are (1) whether the plaintiff had a physical impairment; (2)identification of the life activity upon which plaintiff relies and determining whether it constitutes a major life activity under the ADA; and (3) whether the impairment substantially limits the life activity. *Bragon v. Abbott*, –U.S.–, 118 S.Ct. 2196, 2202 (1998).

Thus, to establish a prima facie case and survive summary judgment, the plaintiff must present sufficient evidence to create a genuine issue of material fact as to whether his physical impairments substantially limit his ability to partake in a major life activity. *Swain*, 146 F.3d at 857; *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir.1996), cert. denied, _____ U.S. _____, 118 S.Ct. 630, 139 L.Ed.2d 610 (1997)("Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act"). The EEOC defines major life activity as, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1996). "Substantially limited" is defined by the EEOC for ADA purposes to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

---

[8]While the plaintiff lists other limitations, this court notes that these are stated in the past tense, evidence establishes that the plaintiff has recovered from them and there is no evidence that the plaintiff has any lingering effects from these other past problems. Thus, this court will only examine those major life activities from which plaintiff still claims limitations.

(ii) Significantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(1996).   In deciding whether a major life activity has been substantially limited, the EEOC provides several factors to consider:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. § 1630.2(j)(2)(1996).

In the instant action, the plaintiff claims that he has limitations on major life activities in that he can no longer play basketball or softball.  However, the plaintiff also states that he has since taken up golf, which he loves.  Depo. of plaintiff at 335-337.  This court finds that an inability to engage in particular recreational activities has never been found by any court to constitute a disability under the ADA and this court is not inclined to rule otherwise.  The plaintiff also alleges that his vision is diminished, affecting the major life activity of seeing, however, no medical records supporting the plaintiff's claim of ongoing poor eyesight have been provided or even referenced.  The plaintiff testified that from November of 1995 until July 1, 1996 when the plaintiff was terminated, he was still experiencing vision problems in that he would sometimes see double, he had poor peripheral vision and his eyes would tire quickly.  Depo. of plaintiff at 218.  However, he also testified in the same deposition that by November of 1995, his vision problems and strength had improved.  *Id*. at 146.  In fact, one

15

of plaintiff's doctors testified at deposition that the plaintiff had no motor deficit and no trouble with his vision. Depo. of Dr. Hart at 23. A second of his three doctors testified that, when specifically asked about permanent impairments, the plaintiff had some residual numbness on the left side of his face, and a little on the right as well, but otherwise had a pretty normal exam by November of 1995. Depo. of Watridge at 36-37. Dr. Watridge stated in an office note that "He has some residual numbness, most of his visual symptoms have resolved and his strength is now normal. He returned to work and did really well with work except for fatigue at night ..." November 8, 1995 office note by Dr. Watridge, submitted at Tab 3 as Exhibit 7 to Dr. Watridge's deposition.

Of course, most of the plaintiff's impairments have nothing to do with "seeing". The plaintiff also alleges that he suffers from reduced motor skills, but no medical evidence of this exists. Moreover, no major life activity is alleged to be limited by this alleged impairment. As such, this court is unable to find any "major life activity" to be limited. While not specifically stated by the plaintiff, this court will assume, for purposes of this order, that the plaintiff has also alleged that his major life activity of working is affected, as the plaintiff does go on to state in his brief that "these limitations in strenuous activities continue and apply not only to work, but also at home." Plaintiff's opposition at 5. However, this court can similarly find no evidence that the plaintiff is precluded from a class or range of jobs by his impairment. Thus, this court must examine whether the plaintiff's ability to work is substantially impaired by the plaintiff's physical condition.

16

Furthermore, while the plaintiff argues that limits on an individual's ability to lift may be enough to make out a prima facie case to survive summary judgment, this court finds evidence from November of 1994 that, at that time, the limit on plaintiff's lifting was raised to 100 pounds.[9] *See* patient note by Dr. Watridge of November 3, 1994, submitted as exhibit to deposition of Dr. Watridge at Tab C to defendant's submissions. *See Mendoza v. Borden*, 158 F.3d 1171 (11th Cir. 1998)(Where court quoted that "the person must provide some evidence beyond the mere existence and impact of a physical impairment" where court found directed verdict for defendant to be correct where evidence showed impairment prevented lifting more that five to seven pounds.) Similarly, restrictions on the plaintiff to prevent climbing do not constitute establish anything more than the existence and impact of a physical impairment.

While the plaintiff did suffer from a life-threatening illness, this is different from meeting the legal definition of "disabled." Plaintiff's impairment, while serious, by all accounts including the plaintiff's, had resolved by November of 1995 except for some residual numbness in the plaintiff's face. Although the plaintiff was incapacitated for several months, his inability to work was not permanent, as is evidenced by the fact that the plaintiff was working at the same pay and for the same benefits as before his became ill at the time of his terminations. An impairment temporary in nature cannot become a disability under

---

[9]This is wholly apart from and in addition to the multitude of evidence which establishes that plaintiff's job never required any lifting and thus no accommodation was necessary in this regard.

17

the ADA. *See Skinner v. Atlantic Marine, Inc.*, 1997 WL 602446 (S.D.Ala.1997), at 4

("Moreover, by the time Plaintiff's termination actually occurred, he had completely healed

and was successfully making his rounds again").   Furthermore, a physical impairment,

standing alone, is not necessarily a disability as contemplated by the ADA. *Gordon v. E.L.*

*Hamm & Associates*, 100 F.3d 907 (11th Cir.1996).   Similarly, not every disability entitles

an individual to the protections of the ADA. *See Zillyette v. Capital One Financial Corp.*,

1 F.Supp.2d 1435, 1441 (M.D.Fla.1998).

The plaintiff here also argues that the defendant was regarded as disabled by his

employer.   Plaintiff cites to deposition testimony to show that supervisors regarded him as

disabled.   The EEOC has explained that "regarded as having such a impairment" means a

physical or mental impairment that does not substantially limit major life activities but is

treated by a covered entity as constituting such limitation.   29 C.F.R. § 1630.2(l)(1996).

A significant impairment is therefore one that is viewed by the employer as generally

foreclosing the type of employment involved, not just a narrow range of job tasks. *Gordon*,

100 F.3d at 913, citing 29 C.F.R. § 1630.2(j)(3); *Standard v. A.B.E.L. Services*, 161 F.3d

1318, 1327 (11th Cir.1998).

In the facts before this court, no evidence exists that the defendant regarded the

plaintiff as having a significant impairment.   Following his illness, the plaintiff returned to

the same type of supervisory job he held before his illness, albeit in a different department.[10]

---

[10]While the plaintiff argues that defendant's reduction-in-force was used as an
opportunity to purge its workforce of those employees which it perceived as disabled, the

18

By June of 1995, Dr. Watridge had informed defendant that the plaintiff could resume his usual rotation and share some nighttime shifts as a supervisor. June 29, 1995 letter from Dr. Watridge. However, in November 1995, Dr. Watridge again wrote the defendant to state that the plaintiff wasn't tolerating shift changes and recommended that the plaintiff work a regular daytime shift. November 9, 1995 letter from Dr. Watridge. However, this court notes that Dr. Watridge testified that he was told by the plaintiff that he was working alternating shifts, which the evidence does not support. Depo. of Dr. Watridge at 12. Dr. Watridge also testified that the plaintiff probably could have worked the 3 p.m. to 11 p.m shift, as long as he was not working rotating shifts. Depo. of Dr. Watridge at 13. The fact that defendant allowed plaintiff to remain on one shift rather than rotate shifts does not demonstrate that the defendant considered the plaintiff to suffer from a disability because such a limitation does not constitute a substantial limitation in the major life activity of working. *See Gordon*, 100 F.3d at 912.

This court thus concludes that the defendant did not regard the plaintiff as having an impairment that substantially limited his ability to work.[11] In fact, even the plaintiff testified

---

plaintiff does not produce the first shred of evidence in support of this argument. Rather, plaintiff merely lists names of those so terminated and an allegation of various ailments from which each of these people suffered. Even if this court was willing to accept this bald allegation as true the mere existence of a medical condition is not the same as a disability as defined by the ADA. Thus, this argument has no merit.

[11]This court notes that it may only consider the time period from April 30, 1996 forward as plaintiff did not file an EEOC charge of discrimination until October 30, 1996. *See e.g. Lewis v. Board of Trustees of Alabama State Univ.*, 874 F.Supp 1299 (M.D.Ala. 1995)(examining ADA filing requirements). The plaintiff fails to address this argument of defendant.

that during this time period, he could have worked any job in the plant. Depo. of plaintiff at 155. He added the caveat that this would be limited to day shift. *Id*. He further testified that he was "definitely" able to perform the duties of his job. Depo. of plaintiff at 175, 228. The limitation to a particular shift does not "substantially limit the major life activity of working merely because it precludes the performance of one particular job." *Standard*, 161 F.3d at 1327. In this case, plaintiff is not even limited from a particular job, but a particular shift for a particular job. Because plaintiff admits he was fully capable of performing his job at all times relevant to this inquiry, he cannot be considered disabled by virtue of § 12102(2)(A) of the ADA. *See id*.

Additionally, while the plaintiff argues that the plant manager Lowell Held, testified that he knew when employees were out with medical conditions, he knew about it, this is not evidence of discrimination against this plaintiff, but rather that the plant manager kept abreast of what was occurring in his plant. Depo. of Held at 13-14. However, Held also testified that he is not sure that the plaintiff had a disability in June of 1996.[12] Depo. of Held at 24. Thus, plaintiff's "regarded as disabled" argument must fail as well.

Based on a consideration of the above, this court finds that the plaintiff has failed to present evidence that would allow a rational finder of fact to find him disabled as of the date

---

[12]Additionally, Held testified that he was not a party to the decision to include the plaintiff in the RIF. Depo. of Held at 20. Similarly, while the plaintiff alleges that medical ailments of various employees who were terminated by the RIF were well known, no evidence is presented that any of these ailments were disabling, or that the employees who were retained were one hundred percent healthy.

of his termination. As such, this court must grant the defendant's motion for summary judgment on this count of the complaint.

## B. The Reasonable Accommodation Claim

While the plaintiff also alleges that the defendant failed to make reasonable accommodations for the plaintiff, the court can find no evidence to support this. Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). To state a prima facie case of disability discrimination, a plaintiff must show (1) that he has a disability; (2) that, with or without reasonable accommodations, he can perform the essential functions of the position he holds; and (3) that he was discriminated against because of his disability. *Terrell v. USAR*, 132 F.3d 621, 624 (11th Cir.1998).

In the light most favorable to the plaintiff, the evidence shows that the defendant even went so far as to create an office job to accommodate plaintiff. See medical records of defendant for 1-28-94, submitted at Tab 17 to plaintiff's evidentiary submissions ("In light of Mr. Barnes (sic) job requiring him to be in areas of potential danger, even tho he does no lifting or climbing, I am placing the further restriction of: his working only in an office-type setting with no work in the active production/reclamation areas of the plant..."). When Dr. Reddy advised against the plaintiff working on the midnight shift, the defendant never again assigned the plaintiff to the midnight shift. Even concerning Dr. Hart, who did not treat the

21

plaintiff for his AVM, the plaintiff admits that "Dr. Hart continued to recommend that it would be best to restrict Mr. Barnes to day time work." Plaintiff's opposition at 10. Nowhere does the plaintiff cite any law whatsoever that a failure to follow a doctor's recommendation, which is never stated as a restriction, is evidence of failure to accommodate the plaintiff legally under the ADA. Furthermore,  Dr. Watridge testified that there is no correlation between AVM and whether a person works a 7-3 shift or a 3-11 shift or even an 11-7 shift.  Depo. of Watridge at 9,10.

Furthermore, this court has already ruled, *supra,* that the plaintiff was not suffering from a disability during the relevant time period as a matter of law. As such, no requirement of accommodation existed. *See e.g. McDonald v. Commonwealth of Pennsylvania*, 62 F.3d 92, 96 (3rd Cir. 1995).  The evidence before this court is that the plaintiff returned to the same type of work at the same rate of pay and with the same benefits more than a year before he was terminated.

### C. The Pretext for Discrimination Claim

The plaintiff also argues that the defendant selected the plaintiff for the RIF as a pretext for discrimination.  However, this court finding that the plaintiff was not under any disability at the time of the RIF, this court need not delve any further into the *McDonnell-Douglas* framework to reach the question of pretext because this plaintiff was not a member of a protected class at the time of the adverse action.[13]  Whether the plaintiff was terminated

---

[13] *McDonnell-Douglas* fashioned a three prong test for focusing the court's examination of the evidence and allegations. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct.

for one deficient performance appraisal does not need to be determined by this court as no evidence was presented that he was terminated due to a disability.

## D. The Breach of Contract Claim

Lastly, the plaintiff alleges that the defendant breached its affirmative action program which was a contract with the plaintiff. As this court understands this argument, the defendant is required to have an affirmative action program because it is a federal government contractor. Plaintiff's opposition at 17. However, plaintiff cites no authority whatsoever that this court in some way can find that the affirmative action program somehow becomes an enforceable contract between an employer and an employee.

The plaintiff apparently argues that because he alleged that he suffered from a disability, he was entitled to preferential treatment in the RIF. Plaintiff's opposition at 18 ("No consideration was given to any possible disability Barnes had at the time of the reduction in force."). This court can find no support for this proposition. Indeed, the Eleventh Circuit has stated:

---

1817 (1973); *Texas Department of Community Affairs v. Barton,* 450 U.S. 248; 252-253; 101 S.Ct. 1089, 1093-1094 (1981). This standard has been used as a framework in numerous different sorts of discrimination cases. First, the plaintiff must establish a *prima facie* case of discrimination. Establishment of a *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee. *Barton*, 450 U.S. at 248; *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997). Meeting this burden creates a presumption of discrimination. *Combs*, 106 F.2d at 1528. Because the plaintiff failed to meet this burden, the burden does not shift to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Id.* Because this point is never reached, this issue of pretext, the third step in the analysis, is not reached. *McDonnell Douglas*, 411 U.S. at 804.

> We cannot accept that Congress, in enacting the ADA, intended to grant preferential treatment for disabled workers.... "We do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense or requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less."

*Terrell*, 132 F.3d at 627; quoting *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir.1995).

Furthermore, while this policy may provide someone with a disability some protection in the event of a RIF, this court finds this plaintiff to not have a disability as that term is defined by the ADA. As such, plaintiff is not entitled to any protection under any affirmative action policy on the theory that he was disabled. The plaintiff alleges no grounds for this court to have jurisdiction of this claim nor whether it is brought under state law or federal law. Assuming that it is a state law breach of contract claim, it is precluded by *Howard v. Uniroyal*, 719 F.2d 1552 (11th Cir.1983).

### V. DEFENDANT'S REQUEST FOR COSTS AND FEES

The defendant, in its answer to the plaintiff's amended complaint, states that "[because the Amendment to Complaint is baseless, RBC is entitled to and requests (a) an award under 28 U.S.C. § 1927 for the excess cost, expenses, and attorneys' fees resulting from defending against it and (b) an award of attorneys' fees and costs against plaintiff under the Alabama Litigation Accountability Act, § 12-19-272 Ala.Code 1975." See amended answer at ¶ 6.

24

The court having considered said request and the court being of the opinion said request is due to be denied;

It is therefore **ORDERED** by the court that the defendant's said requests for fees and costs be and hereby are **DENIED**.

### V. CONCLUSION

In consideration of the foregoing, the court finding no evidence that the plaintiff was suffering from a disability at the time of his termination, the court can find no genuine issue of material fact left for trial. As such, defendant's motion for summary judgment be and hereby is **GRANTED** on all counts of the complaint. This case is **DISMISSED** with **PREJUDICE**.

**DONE** and **ORDERED** this the _____9_____ day of April, 1999.


_____
INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

25